May it please the Court. Good morning, Joshua Bacharach. I represent the defendant, Appellant Reliance Standard Life. I'd like to reserve five minutes of time for rebuttal. Thank you. This is an ERISA disability case and we're appealing from the District Court's ruling that the denial of additional benefits to Mr. Smith was an abuse of discretion. In reaching its decision, the District Court here failed to correctly apply the law in ERISA cases when the standard of review is for abuse of discretion. This Court has repeatedly stated that when reviewing a denial on that basis, the Court's review is limited to the evidence in the administrative record. As this Court has explained, that serves a lot of important functions. One is it cuts down on the cost of reviewing these cases or these claims and it leaves the decision on eligibility to the designated fiduciary from the plan. But the District Court accepted new evidence from Mr. Smith and relied on that evidence in not only accepting it as a basis for finding in favor of Mr. Smith, but also disregarding the expert report from Dr. Weston on behalf of Reliance. The Court accepted that evidence saying that it was doing so in accordance with the Booth case. In Booth, the fourth report that he had never seen Mr. Smith and never talked to him. I never talked to his treating physicians. Well, I mean, I don't, I just had to rely on Dr. Weston's report who never once saw this individual or talked to doctors that had seen him. Isn't that problematic? It's problematic for the claimant and let me explain why. First of all, this Court has never said that you must conduct an IME. Some circuits have suggested that you should conduct an IME, but this Court has never said that. This Court has said we're under no obligation to seek out any evidence and in fact, in Elliott v. Sara Lee, the Court said that you can rely on such report over treating physicians reports. But your comment about not contacting or not speaking with the claimant's doctors, that's not the fault of Dr. Weston. Dr. Weston tried to reach Dr. Klang three separate times and Dr. Klang never responded. Dr. Weston tried to reach Dr. Hannon. Dr. Hannon never responded. It was within a fairly limited time period, though? Within a few weeks, but under ERISA, you have a certain 45-day window to decide and appeal. So it's not like we had the liberty of trying, but again, Dr. Weston time and time again reached out and there was no response from anybody from Dr. Klang's office. So I'd say, Your Honor, that in a situation like this, if that's a concern, it is the claimant's fault and again, there's no obligation to even conduct a paper review like was done here. The claimant has the burden of proof. You knew at the time of the administrative hearing that this individual was not qualified to serve, not able to serve as a plant manager of your own plant. Wouldn't that give him a leg up on the permanent disability? No, Your Honor. Didn't you make the determination that he was not able to serve as a plant manager, which is a sedentary job? It's not, Your Honor. That is a misstatement by counsel. In the administrative record, there is a vocational review. It is a light-duty occupation. That's on, I believe it's page 395 of the record. Counsel, I know, said it was sedentary. It is not. So he went from a light-duty occupation under the regular occupation definition of disability that applies. I realize it changes for purposes of long-term disability, but I have to say this, the record, now I hear what you're saying about not taking additional evidence at the district court. On the other hand, there seems to me to be a lot of evidence that you would be Were you aware that the Social Security Administration had regarded him as disabled? That is correct, Your Honor. And as you know from Black & Decker v. Nord, the Supreme Court has said that they're differing standards. And this court has said they're not binding. I'm wondering if that doesn't, at a certain point in time... And actually, Your Honor, I'm not sure. I went through the record, to be honest, and counsel, correct me, I didn't find the Social Security decision in there. So it may be. I couldn't find it. So I don't want to say that clearly they knew, because they may have. I didn't see it. But the fact is it's not binding. They rely on different standards. But let's talk about the evidence, Your Honor. When you've got a doctor who's saying, two doctors who are saying that he's walking a lot, he's hunting, he's doing well, there are no functional limitations identified in any of medical records. When you look at what Dr. Klang said in the administrative record, he's doing well, he's hunting, he's walking seven and a half or eight miles a day. Did you know that he had had triple bypass surgery? Yes. And many people do in return to work. There's a decision out of the Seventh Circuit like that. Apparently, this gentleman had suffered three strokes. Did you know that? Your Honor, the strokes, the doctor who was treating for that was Dr. Hannon. And Dr. Hannon stated that he was doing well as well. He had recovered. And I'm not sure it was three different strokes. Your Honor, strokes can be significant. Strokes can be minimal. The question is whether they have any residual effects on him. And when he's hunting, there's no dispute that the record said he's hunting. What they tried to dispute after the fact, and by the way, he's walking seven or eight miles a day, as Dr. Klang stated in his contemporaneous treatment records, how is that not possible for somebody to work a sedentary job? What about Dr. Klang's corrected statement? Is that new evidence, or is it simply a clarification of existing evidence? It is new evidence because it's not just a typographical error. There is some muddled wording in his report, the initial reports. It says something about 50 half-mile track. And that's not clear. But if you look- Why isn't the remedy then for you to ask us to remand it so the new evidence can be considered? And then if that's done, the doctors could, Dr. Weston could contact the other doctors? Is that satisfactory to you? I don't think it is for this very reason. Your Honor, that would be the remand. So the if the court believed there was a hole in the record, the remedy then is to remand it to us for further review. That wasn't done. So clearly, it needs to be reversed. The question is, what does this court do? Now, Your Honor brought up the new records. It never should have been accepted in the first place. But since it was, let's look at that. You have- Well, I guess it depends on whether you considered a clarification of an existing record or a new record, isn't it? Well, he said, I meant to say. That's not a transcription mistake. And he had every- My biggest problem with this, Your Honor, is that when Dr. Weston called him, you know, he had no obligation to call Dr. Klang, but he tried three times to reach him. So we've given this doctor every opportunity and two other doctors every opportunity to clarify the record. What evidence did Reliance have in terms of the opinions of Dr. Klang and Dr. Hussain and Dr. Hannan? Did you have those letters in front of you? Not the most recent one from Dr. Klang. They had summary, conclusory reports from Dr- Well, let me take a step back. From Dr. Klang, what do we have? He's doing well. No symptoms. Can walk seven or eight miles a day. And he's hunting. Well, that certainly supports it. Their bottom line conclusion, they all eventually said that this gentleman was unable to work- Well, Your Honor- In any occupation, which is the standard. Your Honor, a few things. One is you have to toss out Dr. Klang's report from consideration at this point. It's improper evidence. It has to be. So the next question is, what did Dr. Hannan say? Dr. Hannan simply listed certain diagnoses and then said, based on it, based on these diagnoses, he's officially disabled. I don't know what officially disabled means. That's not a term in the policy. We don't know what standard he applied. But more important is this. In Griffin v. Hartford, a case that came out this year, it's a published decision from the Fourth Circuit. The court held that a doctor can't simply say that the person's disabled. They have to identify- the claimant has to identify objective functional limitations in the record. Dr. Hannan simply said, here are some diagnoses. And by the way, some of them were incorrect. He said that he had uncontrolled blood sugars. The contemporaneous office note said, no, it was controlled at the time. The same thing with Dr. Hussain, whose report- and I beg your honors, read those two reports of Hannan and Hussain. They say nothing. They list diagnoses and then say they can't work. The question is, why they can't work? What prevents them? And the law in this circuit is clear that they have to explain. I hear the claimant saying that you ignored evidence that was actually in the record about the pain that he was experiencing and the negative effects that stress would put on his health. And they're saying that this was submitted as written evidence and it wasn't dealt with. I'd like to see where, Your Honor, because Dr. Weston dealt with every record, every claim. And Dr. Weston also referred, by the way, to the most recent objective evidence, which was June 2016 EKG. It showed a 55 percent ejection fraction, which means that there was normal left ventricle function and that there were no symptoms anymore. So, yeah, he did have issues. But the most recent testing was almost normal. It showed that the valves were clear. The arteries were clear at that time. What about his dizziness? Wasn't there some evidence that he had fallen out of a truck due to dizziness? Years earlier, I believe it was. So, again, what we look at is the contemporaneous records. And as far as blood pressure goes in hypertension, in September of 2015, the same Dr. Klang said that his hypertension was controlled. That's page 482 of the record. There was mention of kidney problems in November of 2015. On page 425 and 426 of the record, those kidney problems had resolved. I'd mention the blood sugar. That was under control. So, I'm sorry, Judge Britt said that we didn't cite to or refer to certain medical records in reaching a decision. Those records dated back to 2013. This was a 2016 denial. So we look at the most contemporaneous records. And what those records say is this person is walking seven to eight miles. This person is hunting. This person, every doctor says he's doing well. How could you take a look? Now, let's look at the subsequent... What do you mean every doctor says he's doing well? You've got three doctors that have concluded as a bottom line matter that he was unable to work in any occupation. Well, no, Your Honor. Let's look at the contemporaneous notes. They went back. Plaintiff went back and said, can you support my disability claim? And these doctors provided empty reports. They say nothing. They list diagnoses and say that he can't work. That is never, never the rule on eligibility under the law of this circuit. They have to prove why. They have to identify objectively functional limitations. In fact, even under de novo review, this court has held that a claimant must come forward with objective, and under our discretion, we have doctors saying... And not just Dr. Klang. It's important to look at Dr. DiPaolo, too, because that doctor corroborated everything that Dr. Klang said around the same time. Dr. DiPaolo said that he's doing well, he has no angina or symptoms, and he's walking about 40 miles, which is consistent. If you look at Dr. Klang saying he's walking seven to eight that's about 40 miles. And there's no question about the accuracy of Dr. DiPaolo's reports, but what did the district court here do? The district court said, well, his condition must have worsened in those few months between Dr. DiPaolo and Dr. Klang. Absolutely not. That's the district court substituting its own judgment. Well, didn't the district court, getting back to the issue of dizziness, didn't he cite doctor's notes from June 3, 2016 and June 21, 2016? The district court... You told me just a few minutes ago they were all old, and it looked like they weren't all old, because when you look back at Judge Britt's opinion, he was referring to 2016 evidence, wasn't he, when he was talking about dizziness? Well, the court, there were some... I'd have to look at that specific, and I will when I sit down, but there were specific records as far... By the way, I believe that's... Yeah, that was. That's during the period of the denial. So as we know from Dr. Hannon and Dr. Hussain, claimant went to them and was asking for the support for the disability claim at that time. So that's especially why in a case like this, you have to look at the objective evidence. So is there dizziness? Well, let's see. His hypertension's under control, we know that, and we have this EKG, and the EKG shows he's doing great. And all of the doctors are saying And I know I'm running into my time a little, but it's important to point this out. The judge here said that doing well is just boilerplate. That's just not true. A doctor's not going to say he's doing well, but he can only walk a half a mile, he's that impaired. A doctor's not going to say he can hunt, but he's so impaired he can only walk short distances, and he has dizziness, and he has all these problems. So you're saying physicians never refer to wellness in a relative in terms of giving the history and the chronic as well as acute problems clinically, that you say they're doing well. It doesn't mean like, oh my goodness, he's cured. No, based on a person with a history of It's in the context of the whole history. You object strongly, I should say, and you should, when you're doing your job, and say everything is 2013. But that's important. People just don't get over renal problems. I mentioned, you mentioned kidneys. Well, he's doing well with kidneys. What do you have in the record that say that his renal problems were totally resolved? There is a report on page 425 and 426 of the record, and again on 487, which says his kidney problems cleared up. Is that a creatine number? Do you have a number? It was a treatment by a specialist, I believe, for it. I don't know that it listed. But it's normally done by, you can tell, it's a number, by blood. Do you have the blood work? I don't have that on me. But, Your Honor, I'd also point this out. So he is having kidney problems. How does that prevent him from performing sedentary work? So there has to be limitations, objective limitations on an ability to do sedentary, not light duty, not heavy, medium, sedentary work. And if he's hunting, if he's hunting regularly as he was, and he's able to walk as much as he was, come on, Your Honor. The two points I'd like to make. First of all, I think the Chief's point was well taken, because a lot of people who are just out of the hospital, you call and you ask how they're doing, and they will say, well, they're doing well. And what they mean by they're doing well, they mean they're doing well compared to what they were doing when they were in the hospital a few days ago, or that means that they are progressing. And that seems to me a relative term. And the difficulty I have is simply multiplicity of conditions that this individual has. It was not just one event. It was multiplicity. And then you've talked about him walking, and you've talked about him hunting, but those are relatively stress-free occupations or pursuits. And the doctors here indicated that a lot of the difficulties that his heart and from the strokes and everything were stress-related. And, you know, some people as they age, their conditions will recur when they are subjected to severe stress. And for some people, returning to an occupation can provide the stress, brings on a recurrence so when you say, well, he's hunting and he's walking, there's a whole lot of difference between an activity in a stress-free environment and an occupation which is almost intrinsically stressful. And those kinds of things, the stress wears on people because they have less, their health systems have less margin for error as they age. And I think that that's, you know, I think it's important to just look at the total context of what is presented here and not to just sort of rush to the conclusion that he's a robust, healthy individual when you have this kind of medical history that doesn't seem to be disputed. That's all I'm saying to you is that I think the total context here is concerning. Well, Your Honor, if the doctors had said that, that would have been addressed. I'd like counsel to point out where the doctors said anything. They say that a lot of his problems were stress-related. In his job as a plant manager, which is different from a sedentary occupation, which they identified as being doing some sort of clerical work even, which did not involve stress. There's no indication that any of the alternative occupations involve stress. And this court has also said, Your Honor, that when you're dealing with stress issues, there has to be some proof of it. You know, you can't just rely on, you know, for example, Stanford versus Continental Casualty Company. That was a case where there was a claim of, if you put me back to work, I'm going to become disabled again. And this court rejected it, saying that it was conjecture. And it's the same thing here. In fact, it's less so here. That case dealt with a drug-addicted nurse anesthetist. This case deals with somebody who would go into any occupation, any. There's no evidence, they provided no vocational evidence, that any of the alternative occupations we identified were stressful. And I understand, you're right, Your Honor, there were a myriad of conditions. And when you look at the evidence here, and I agree, doing well may be a relative term. But when you're doing well and you're walking, as to the extent he is, when you're doing well and you're hunting, when you're doing well and you're saying to the doctors, I have no symptoms. I have no angina. I have no symptoms. That's what he told Dr. Klang in the records. That's what he told Dr. DiPaolo around the time of the denial. That's what you have to look at. And so if he comes back and says, well, the doctor said he was disabled. Again, I urge the court to look at the language in Griffin v. Hartford, which came out last year. It's published. And this court said you have to provide objective medical functionality, proof of actual objective functionality limitations. And in this case, the most recent test, EKG, supports us. And you read Dr. Hannon, you read Dr. Hussain, and they say absolutely nothing. They list diagnoses and then say, yep, he's disabled. This court has repeatedly held that's insufficient. I'm not sure if I have any more time left for rebuttal, but if I do, I'd like to reserve it. I will give you some. Yes. Thank you. Thank you, Your Honors. Mr. Butler. May it please the court. I'm Stuart Butler. I'm an attorney from North Carolina. I represent Freddie Smith and his wife as appellees in this matter. The real issue in this case is whether the lower court was correct in concluding that the appellant, Reliance, abused its discretion in denying Freddie and Beth Smith benefits by blatantly ignoring the unequivocal opinions of at least three and potentially five treating physicians, and instead relied on its own hired gun and by cherry-picking medical records. The best evidence we should know- Could you step up a little closer to the microphone? Yes, sir. I want to be certain that I hear you. Yes, sir. The best evidence, and I'm sure the court has reviewed it. If you have any doubt as to what Reliance was relying on, look at their nine-page denial letter to Freddie Smith, September 1, 2016. Detailed letter goes into treatment as appellant's counsel referenced, doing well. But one thing they don't do in this nine-page denial letter is indicate the two or three medical opinions that are unequivocal from treating physicians that this man, Freddie Smith, is unable to perform any, any occupation. Now, what about the conclusory nature of the doctor's statements and the argument from Reliance that there is no explanation in this record of how these conditions cause any particular limitation, for example, on his movement, on his endurance, on his gait? Right. You know, what, what, what is, I think there have to be more than just, he has these conditions, he's totally disabled. Doesn't there have to be a causal link, some sort of explanation? And there is more than that, Your Honor. These physicians treated Freddie Smith, it wasn't like that he went to them for some opinion, hey, hey, render me disabled because I've got this claim with Reliance Insurance Company. You know, with all due respect, the appellant's position that they have, these doctors that treat this man have to go by and check these boxes, that's, that's not the reality of modern medicine. It's not the reality of what these, these folks do. They're treating, they're treating physicians. They are not expert retained physicians. They are trying to make Freddie Smith's life better with his uncontrolled diabetes, with his uncontrolled coronary artery disease, with the strokes. With, that's what they're doing. And if they don't check a box, we don't believe that should be held against Freddie Smith. Because that's not what they're about. The, the doctors Hannon and Hussain unequivocally had stated he was officially disabled prior to that September 1, 2016 letter. The, and again, doctor, the lower court correctly concluded that by essentially cherry picking these, these, these statements, he's doing well, he can do, he can do this, he can walk this, he can hunt. They didn't, the lower court referenced three specific opinions, or three specific medical opinions that did corroborate, to respond, did corroborate the diagnoses of these treating physicians. The, there, there's the, the Helton case that at least in the brief, the appellants seem to believe is some sort of magic bullet that, for the appellant because of extrinsic evidence considered. And in the, as the court's well aware in the Helton case, the court actually did conclude that, that the, could consider extrinsic evidence if it were known to the plan, plan reviewer at the time. We would submit, we would submit that in fact, the statement of Dr. Klang, and I'm going to read it in a minute. The, the, the, the nonsensical statement of Dr. Klang, which the appellant hung their hats on in, in denying my, my client disability, was just that, that, that's what, that's, that's what these folks did. Well, why wasn't it new evidence though? Well. Dr. Klang's restatement of his position came in front of the court. Your Honor, what this was, and, and if you, I've got it, if you can read, read what his original report said, and I'm just going to read it. Remained active, including hunting. He is previously going on about 50 hyphen one half miled. M.I.L.D. tracks did tend to leave him sore, lower extremity, so he is back, but can do seven, eight half miles without problem. Now, the reality of this, as it related to this claim, was that it's denied, Mr. Smith comes to me, we review these records, including Dr. Weston's report, where Dr. Weston, the IME doctor, on pages three and pages six of his report, that's in the record, clearly, clearly emphasizes and relies on this nonsensical statement by assuming that he could walk seven miles without problems. Dr. Klein corrected his letter to the court's question. We would submit that this is an error caused by a voice activated software, for goodness sakes. All these doctors now, most of them, they're dictating their medical records, and things get messed up, as we all know, in voice activated software, and that's what happened. Dr. Klein, in record time, we submit, corrected his report and said he can ambulate about half a mile and walk eight miles weekly. That's significant. What's more significant is that Dr. Klein concluded his report by saying, I agree with Drs. David Stewart, Ali Hussain, M.A. Hannon, and Patricia McGaffigan, she's the social security doctor, that the patient Smith would be unable to perform any gainful occupation, period. Now, the appellants conclude that's new evidence. We submit that the report, the erroneous report that they relied on in their denial was known to them, and that they just picked the best phrases, the best words to justify their decision. So we believe this is a corrective report. The lower court... It's always a question to me about what is new evidence and what isn't. And sometimes you say, well, new evidence is anything that the trustees didn't mention. Right. But as you point out, sometimes they can knew about it or maybe should have known about it. Right. And even though it's not mentioned in the trustee's letter of denial, if they knew about it or should have known about it or whatever, they're not under a duty to fish it out, that's for sure. But if it was in the universe of evidence that they should have known, even though they didn't mention it, it's not necessarily new evidence. And to the court's inquiry, we agree with the appellant that there's a reason that the record needs to be closed at some point, according to the case law. You can't leave it open indefinitely to promote speedy reconciliation of the claims. But this is not a case... I would agree that had Mr. Smith gone to a different doctor or had he gone to the same doctor for a subsequent evaluation, that would be a new record. This is corrective. That's all this is. This is corrective. We think that's significant. And we think it was known, essentially, to reliance at the time. But let me ask you a question. Sure. This is one that may be a little difficult, but that's what you hear for oral argument. What might be a question, a pause, and that's this. Your colleague's response to my dear friend Judge Wilkinson as to the hunting, which is undisputed, right? That's not to be corrected. That he says that what he was offered, what they purported he could do is sedentary. And those choices are all, his words, stress-free options of work. How do we square you can hunt, even though in a non-stressful... I think that's correct. It's recreational, non-stressful, sedentary. Tell me, what is your direct response to that? Yes, sir. The response is that, first of all, hunting is, as the court has already pointed out, it's not... I don't know if it's stress-free or not. I'm not a hunter, but... Let's assume that it is. I'm assuming that it is stress-free. I think counsel did the same thing. Right. And if the evidence were, which we believe it would be, we don't... Unfortunately, in ERISA, we don't have the luxury of discovery, of depositions, of interrogatories, at least in this matter. But if we believe that Freddy Smith leads, guides, is a hunting guy, and he walks when he does it. So I don't know. I don't know how to respond other than he told the truth. He could have, I guess, not said that, but he told his doctors what he was doing. They asked, what are you doing? He didn't tell them, I'm walking seven and a half miles a day without problems, according to the corrective record of Dr. Klang. That's what he says. So Alliance didn't give you sort of an idea of what the jobs they were purporting to be sedentary that he would do? Well, it's in there. They have a definition of sedentary. We contend that a plant manager, he's not out on the loading dock. No, no, no, no. They're taking it off the table. That's light. They said it's gone from light to sedentary, so plant managers off the table. I'm just trying to get the point to argument to whether the issue is joined correctly, factually and legally. So it's not plant. It is sedentary, which means, basically, my understanding is that it's a job that you can sit down and do it almost 90% or more. Correct? Yes, sir. That's what sedentary basically means. And I'll give the example that I think about is taking up tickets at a movie theater. You sit there, you take a ticket. I mean, I don't know. I've never taken up tickets at a movie theater, but I assume that's fairly— It's the one that the Social Security comes up so often. There are 500,000 ticket-taker cashier jobs available in the universe. It's always interesting. Go ahead. But the records also reflect—the medical records also reflect issues that Mr. Smith might have with the medications he takes, which is myriad medications for the problems he has. So, you know, to get into a nuts and bolts discussion of what he actually can do and can't do, you know, I'm not sure it's all in the record. What we do know is that these physicians who have examined him and who have a far better opinion, or we would submit, a far better idea of what this man can and can't do, it's not like it's two to one. It's unanimous. They all conclude the same thing. And I will say this, that Dr. Weston, in his IME, he did mention three treating physicians that determined he was disabled. He mentioned Dr. Stewart, Dr. Hussain, and Dr. Hanna. But I thought it was interesting, and we think words are important. We think the words, you know, especially in a ERISA claim, are very important because that's all we've got to go by. But he said his prognosis was uncertain. And he said, this is an exact quote from Dr. Weston, and when he went to the, regarding impairment, the key conclusion, and he recited the walking eight miles daily twice. It bases part of that opinion on Mr. Smith's apparent ability to walk seven to eight miles. Apparent. So I don't know what was in Dr. Weston's mind, but he didn't, but you almost wonder if he thought that those statements were in error. As to calling, as to appellant's contention. One of the things that we look at is there's sort of a hazy line between what's subjective and what's objective. And the claims that we look at, I suppose, most skeptically are when people are sort of complaining about just not feeling good or that they're, you know, that they're feeling depressed or whatever. They're just sort of hard to get your hands around those kinds of sort of, they're very diffuse issues. You know, hypertension, everything. But here, for me, when you combine the opinions and the ultimate conclusions of three different physicians and treating physicians, and they all say he can't perform any occupation. They speak to, and I just can't, you know, a lot of times a treating physician will say, well, I want to do what I can for my patient. And they'll just produce some sort of boilerplate thing that says he's disabled. But I can't believe that three different physicians, you know, I'd almost have to assume bad faith on the part of three different physicians to have, that they all came up with a pretextual or just, oh, let's help the guy out kind of thing. And then we don't have just subjective complaints of depression or not feeling good. The man has had three strokes. Right. And we would point out it's in the record. He's had triple bypass surgery. Those are, strokes are stress-related. And bypass surgery and cardiovascular health is stress-related. Yes, sir. And these were real things. Mr. Smith, by the way, it's in the record. He'd worked 31 years. It wasn't like he was a, most of it as a plant manager. And had, it's in the record as well, glowing reports from the owner of the plant. And Mr. Smith wanted to go back to work and did, even after the triple bypass surgery. So it's a situation, your honors, where we think the medical evidence is not just balancing the scales. It's overwhelming. And the medical evidence in this case, and if you can nitpick, this doctor didn't have this, didn't run this test, or didn't conclude this. But we submit that it's overwhelming. There's actually five doctors, if you include Dr. Stewart, who was his previous treating physician, and Dr. McGaffigan, who was a social security doctor. So all these people, all these doctors saw him. And the appellant, who apparently had a right under the policy for an IME, decided, well, we'll send it to good old Dr. Weston in Florida. And I don't know, you know, we don't have the opportunity to find out how much, what Dr. Weston does and who he does it for, unfortunately. But we submit that under the pool factors, clearly the conflict of interest in this matter is, and the lower court found that. And the lower court addressed Helton. And the lower court, you know, concluded that this decision was not the result of a deliberate reason process. And we submit that the lower court was correct. The appellant mentioned something about the claimant waiting to file this report. Again, again, that's the red herring. This was a corrective report from Dr. Klang. The court, the lower court really had expressed concerns about the fact that Dr. Weston was the only doctor, non-treating, who concluded that Freddie Smith was not completely and totally disabled. Your honors, our, in conclusion, we submit that the district court properly applied the Booth and Helton law when it concluded that Reliance abused its discretion when determining Frederick Smith didn't meet the definition of total disability under the policy because they didn't rely upon substantial evidence and instead relied upon an inaccurate medical report as demonstrated by the incoherent language which they were in possession of at the time they rendered their decision. And that they properly, and that their own medical determination, given its inherent Dr. Weston's and Reliance's inherent conflict of interest and the overwhelming evidence to the contrary that was not considered by Reliance was not the result of a deliberate principled and reasoned process. Thank you. Thank you, Mr. Melvin. Thank you. Judge Keenan asked counsel what objective evidence there was in support of the conclusion of the doctors. And counsel didn't provide any. He went on rambling about they said they treated and they said he can't work. But he didn't provide any of that conclusive evidence, any objective testings or findings that, again, in Griffin, this court said you have to present if you're making a claim. Counsel also refers to Dr. Klang's report and says that we relied on the nonsensical part. But in the very next month's office visit with Dr. Klang, he again stated he's able to do eight miles. That's after the nonsensical one. It's consistent with the earlier one that he can do seven and a half. It's consistent with Dr. DiPaolo's statement that he's doing great, no angina, no symptoms, and can do 40 miles. So this isn't a corrective report. It is a new opinion. It's outside the administrative record. I don't know how counsel can really argue against that. And with all due respect, Judge Wilkinson, this isn't within the findings of reliance. It cannot be said that they should have known of this opinion. This is entirely new evidence. It should never have been considered. And if the court thought it should be, under the Berry case and other decisions, there's only one thing the court should have done, and that's remand it. So if this court thinks that there was an issue, what this court has to do is remand the claim, too. To allow the judgment to stand in this case is contrary to every bit of law of this circuit on how you review a case under the abuse of discretion standard. I think it's also important to comment on the fact that he said that Dr. Weston did nothing to confirm these things. Well, he did. How many times did Dr. Weston have to try to call Dr. Klang to get a response? Or Dr. Hannan and Dr. Hussain? And I think in a situation like this, where you have the reviewing doctor contacting the claimant, you have essentially the arm of the fiduciary going out there and trying to obtain new information, and that person disregards you, then that has to mean that any findings that there's an ambiguity in those records must be held against the claimant, and there must be a finding that they fail to sustain their burden. Because we did everything we needed to do. And when counsel says, well, Dr. Klang got back soon enough. No, it's not soon enough. The record was closed. And the law of the circuit's clear. When the record's closed, you can't submit that new evidence. Yeah, you know, you said, I think, at the very beginning, and you were right, you're required to have an IME, but you knew you had a Herculean task when you had a unanimous physician saying that he was totally disabled. You knew that. So when you made the decision that you're going to go to Dr. Wesson, non-physical, just review the records and make a determination, you chose your weapon. So you come here now and say, well, but notwithstanding, it all said that he's totally disabled. And even assuming that it was seven or eight, even with that, they still said so. So going down, in a sense, cuts against you. Because it said, even if assumed they thought it was seven miles and hunting, all of that still, given his history, they said he was totally disabled. And you decided not to seek an independent medical evaluation. So you're not required, no. But the law won't do for you what you won't do for yourself. And now you come here standing and you made a determination against that very, very awesome mountain of experts who treated him and said he's totally disabled. But now you're saying, I got this and that, but they are burdened. But that's quite a Herculean for you, isn't it? I disagree. Judge Gregory, here's the reason why. If there's no reference to the fact that he's hunting regularly and that he's walking seven or eight miles, again, now if you say, well, you have to look and we have to take a step back and maybe that's not what was meant, that seven or eight miles. I think it was. I think that the doctors did. The doctor did rewrite his opinion. But then again, you have to, based on a new record, you're looking at. So we're looking at the record that existed. And at the time when there's references to hunting, walking seven or eight miles, and there's a normal EKG, or as close to normal as there can be, and other records saying his other conditions are controlled. Is it necessary? I'm just not sure what a remand does other than, I mean, it seems to me that Reliance has reached a foregone conclusion about this man. Your Honor, I respectfully disagree. I'm just not sure what a remand will do. You know, I agree that normally the course is, often the course is to remand. But at some point also, there's got to be an end to the ping pong. And it just, it does just drag out the process. All of these, there's so many different layers of review in the social security cases and these disability cases. And the process just drags on and on. And no one's ever certain of where they stand. And I just wonder, if we remand on this, whether Reliance isn't just dug in. And if we're going to come to the same conclusion tomorrow that it came to yesterday. I mean, that's what I'm, I don't want to be party to a fruitless exercise. Because if you've got before you this kind of medical history and three physicians that are saying he's not, he can't undertake any occupation, what is going to change your mind on remand if in the face of that evidence, you found him not eligible for long-term disability payments? That's essentially your conclusion. And it isn't, and if in the face of what we have before us, that was still not enough. You know, what's going to cause you to reach a different result? Your Honor, I can only speak as to my client. And, you know, to be honest, I'm concerned that you think it's a foregone conclusion. Because I can tell you that many, many claims are approved. It's a foregone conclusion because in the face of the three different physician opinions and in the face of a triple bypass and three strokes, he was still denied disability evidence. The man had, I know the standards are different, but he was on disability through the Social Security program. You'd had him on short-term disability. You knew yourself he couldn't do the, he couldn't continue to perform the job of a plant manager or whatever. And there was discussion about whether that's sedentary. But at some point, it just makes me, it just makes me think that this case is not going to reach a different result. So why churn it? Well, I respectfully disagree. I can tell you that there are claims that have been remanded by courts where the same decision was reached. And there are claims where it was remanded that the, that the, the fiduciary reached a different conclusion based on the evidence. And, and that's the, that's the key is based on the evidence that's before it. And here the court relied on improper evidence. But I'm troubled by your, by the court's comment about three opinions versus one, because that's contrary to this court's decision in Elliott versus Sara Lee, where this court said that even when there's conflicting evidence, that's not evidence of an abuse of discretion. And it's contrary to Black and Decker versus Nord. We could have 10 doctors on the one side versus one. There's no scorecard kept. You can't divide and conquer with respect to the evidence. You have to consider the evidence in its totality. And the, it is not as if the physician, the opinion of the three physicians just came out of nowhere. As the chief pointed out, they came out of a context and a history of, of various medical ailments, which were not trivial. These are not, these are not fabricated or made up conclusions. They have a medical history to back them up. Your Honor, in the Gallagher versus Reliance case I mentioned earlier, it's de novo review. The man had a history of heart disease, a history of heart disease. He had hypertension. I believe it was a case that I argued more than a decade ago. So there are a lot of similar facts. He was an older person. There was a change in definition to a sedentary standard. And this court, by the way, originally the court ruled against Reliance under abuse of discretion standard. This court held that was wrong. It should have been de novo review. But then this court held under de novo review, it was not a wrong decision. Why? Because the claimant didn't come forward with objectively satisfactory proof. And that's the point that I'm making here is, yes, he had this history. And I can cite to you cases, a Leipzig case out of the Seventh Circuit. There are cases within this circuit, the Hype, I'm going to mispronounce the name. It's in our brief. A case that dealt with the same situation with a person that had a history of heart disease and bypass surgery. There are numerous cases. It doesn't mean the person is totally disabled forever. So you look at their activities. You look at the fact that they're not claiming that they have symptoms currently. You look at the EKG in June of 2016. They all support the decision. You're a very capable practitioner in this area of law. And you know that there are cases that go both ways. Of course there are. And you know that there are cases out there that say you do have to accord some degree of respect to the fact that the opinion proffered is that of a treating physician. And you do have to make sure that the trustee is not cherry picking evidence and everything. I mean, these cases tend to be rather medical specific or whatever. But you cite, and very accurately so, the cases that support your position for a remand. But there's also a raft of cases, you know, which do accord greater respect to treating physicians and which do indicate that you have to deal with the abuse of discretion standard requires not cherry picking evidence but dealing fairly with the evidence in its totality. So, you know, all I'm saying is the case law is, if I may pretty gently, a little more mixed in terms of its conclusions than you've presented it. Well, not on the one point, Your Honor. I respectfully disagree. The Supreme Court held in Black & Decker v. Nord that you don't have to accord any special weight to the opinions of a treating physician. So they aren't entitled to that little nudge in their favor. And so what do you have to do? You have to look at, here's their doctor's opinion. Is it reasonable and is it supported? Same thing on our side. That's the thing here. So is it reasonable, because it's abuse of discretion, was it reasonable for Reliance to reach its conclusion? Well, again, it's a sedentary level occupation. We know he's walking seven or eight miles a day. We know that he's hunting. We've got all of that there. And what opinion? Your Honor mentioned stress. There's no evidence that stress was affecting it. And I can tell you, even in medical journals, forget about lawyers, because we say anything, right? Medical journals question whether stress leads to increased risk of heart disease. Medical journals question whether stress will cause a stroke. And so there are cases, you're right, that go both ways. But I'm looking at the facts in this case. And the facts in this case- I mean, I don't want to prolong. I understand, Your Honor. I may, you know, I may be a, I don't pretend to have any great background in medical knowledge. But for you to stand here and tell me that cardiovascular conditions and heart attacks and strokes and the like are not related to stress, I don't care how many studies you can throw at me. I know that those events are not aided by stress. Now, to what degree they are brought on by stress, I do not know. And to what degree that stress is a primary cause as opposed to a less than primary cause, those I do not know. Because they're genetics that begin and diet and all kinds of things. So they're multiply caused. But I do not accept the position that, and I don't think many physicians would, that stress has no bearing on these very unfortunate events. May not be the sole cause. Probably isn't. But it's an aggravating cause. But where's that in the record, Your Honor, at the time of this denial? There's not, it's not. You know it, I know it. But Your Honor, no, Your Honor, and also with respect to these occupations- I'm not going to get in a perpetual argument with you. I understand. You've made your points and you've made them very ably. And I've expressed some skepticism. I understand. If I may just conclude, Your Honors, and I do thank you for the additional time. At the very least, there has to be a remand. The court considered extra record evidence. And under Berry, that requires a remand for us to consider that new evidence. And maybe during that remand, they say, oh, you know what? That panel said we should do an IME. It's a few years later, but let's do an IME. Because if anything, it would be worse, if anything. So let's do an IME now. You never know. So at the very least, I think there has to be a remand. But- So you get a do-over. Well, they had one, Your Honor, when Dr. Clank submitted new evidence. Well, we're still quibbling over whether it's a correction or not. But that's not a do-over, if it's just to correct one aspect or another. But I see what, no, I understand exactly what you may do. As Thomas Jefferson said, one has a right to be smaller today than they were yesterday. So yeah, I understand that. But I must echo Judge Wilkinson. You bit off a lot more than you could chew. And you suggest to us that stress is not related to those things. But anyway, thank you so much for your able representation of your client, as Mr. Butler as well, to representing his client. With that, we're going to ask the clerk to adjourn the court until 8.30 tomorrow morning. And then we'll come down and greet counsel. Thank you, Your Honors. This honorable court stands adjourned until 8.30 tomorrow morning. God save the United States and this honorable court.
judges: Roger L. Gregory, J. Harvie Wilkinson III, Barbara Milano Keenan